[No. 30299. Department Two. February 26, 1948.]

JAY D. MAPLE, *Respondent*, v. BEULAH E. MAPLE, *Appellant*.[1]

[1]Reported in 189 P. (2d) 976.

*Horrigan & Leavy,* for appellant.

*Moulton & Powell* and *Thomas B. Gess,* for respondent.

STEINERT, J.—This was an action in which the plaintiff by his complaint, and the defendant by her cross-complaint, sought a divorce, one from the other, on the ground of cruel treatment. After a hearing, the court made findings of fact, upon which it entered an interlocutory order adjudging the plaintiff to be entitled to a divorce, granting to the plaintiff the custody of the two minor children of the parties, and declaring void a certain "interlocutory judgment of divorce" previously obtained by the defendant in an action instituted by her against this plaintiff in the state of California. From the interlocutory order made and entered by the trial court in the present action, the defendant appealed.

The defendant appellant assigns as error: (1) the refusal of the trial court to recognize as valid the interlocutory judgment of divorce which the California court pronounced and entered; (2) the order granting a divorce to the respondent, and the refusal to grant the same relief to the appellant; and (3) the order awarding to the respondent, and refusing to award to the appellant, the custody of the two minor children. We shall consider these assignments in their numerical order.

The trial court held that the interlocutory judgment of divorce previously entered by the California court was void, on the ground and for the reason that, at the time of

commencing her action in that state, appellant had not established the residence requirements necessary to give that court jurisdiction of the cause. The facts on this phase of the case are as follows:

On December 15, 1931, respondent, Jay D. Maple, and appellant, Beulah E. Maple, then residents of California, were united in marriage in Kingman, Arizona. During the first ten years of their married life, they lived in Wilmar and other towns in California, where respondent was employed by Metropolitan Water District. In the fall of 1941, respondent severed his connection with that organization and, accompanied by appellant, moved to Henderson, Nevada, where for about twenty months he was engaged in defense work. During their stay in Nevada, the greater portion of their household furniture was stored in a warehouse in Long Beach, California.

In July, 1943, the parties came to the state of Washington, where respondent had been offered employment in construction work upon what is termed herein the Hanford Engineer Project. In November of that year, they rented a furnished house in Richland, Benton county, Washington, and lived therein continuously until about the middle of October, 1946. The greater portion of their furniture was left in storage in Long Beach. Although at various times respondent expressed the desire to bring the furniture, or portions of it, to Washington, this was never done, because of appellant's insistence that she could not use it in the furnished house which they were renting.

There is a dispute in the evidence as to whether the parties at any time intended to establish a permanent residence in this state. Appellant testified that her husband promised her that, if she would accompany him to Washington, they would remain in this state just one year and then return to California, where they would buy a home; and that it was never the intention of either of them to give up their legal residence in California. Respondent testified that, when they first came to Washington, they did not know how long the work would last, and, for that reason, they did not at first have in mind establishing a permanent residence

in this state; that later, however, when the construction work of the project was completed, respondent was transferred to operational work, and, it then becoming apparent that he would have steady employment indefinitely, both he and the appellant thereafter considered themselves permanent residents of the state of Washington, with no intention of returning to California.

In 1944, the parties registered for voting purposes in Richland, giving their address in that city, and thereafter voted in the general election of that year. They also, from that time on, regularly took part in various community activities and acquired a wide social acquaintance.

At the time of coming to this state in 1943, they had one child, approximately two years of age; about a year later, while they were living in Richland, another child was born to them. Both of the children are girls.

Upon the evidence adduced, and as thus far outlined, the trial court found that the parties intended to, and did, establish a residence in the state of Washington.

As will hereinafter more particularly appear, marital difficulties developed between respondent and appellant, reaching a climax in the latter part of 1946, three years after their arrival in the state of Washington. On October 13th of that year, while respondent was on a hunting trip, appellant took the two children and, without respondent's knowledge or consent, left for California. She also took with her a number of government bonds belonging to the marital community, the cash value of which amounted to $3,725, and the proceeds of sale of certain household equipment amounting to $90; she left an equal amount of similar bonds for retention by respondent.

On November 4, 1946, approximately three weeks after her arrival in California, she filed in Los Angeles county an action for divorce from the respondent. In her complaint, she alleged that for more than one year last past she had been a resident of the state of California, and for more than three months immediately preceding the commencement of the action she had been a continuous resident of Los Angeles county. It is conceded that, under the laws of

862

California, residence in that state for one year preceding the commencement of an action for divorce is required.

Upon his return from the hunting trip above mentioned, respondent, finding that appellant had left him, made continuous efforts to locate her and the children. It was not until three weeks later that he learned that she was staying with friends in Long Beach, California. He thereupon made a trip to that city and, after finding appellant, endeavored to persuade her to return with him to Richland. She refused, saying that she wanted her freedom. After many fruitless discussions between the parties, respondent, at the insistence of appellant, went with her to the office of her attorney, and there, on November 14; 1946, they both signed a "property settlement agreement," as drawn by the attorney.

The agreement provided that appellant should have the care and custody of the two children, and that respondent should pay twenty dollars a week for their support while the children were with the mother; but that respondent could take the children to the state of Washington and keep them until such time as appellant was able to establish a suitable home for them in California, at which time respondent was to return them to her, upon her request.

The agreement further provided that appellant was to have all of the furniture and household equipment belonging to the parties, together with the cash or bonds then in her possession, and that she should use the furniture and equipment for the purpose of making a suitable home for the children, but that she should not sell or encumber the property without respondent's consent.

During the conference at the attorney's office, respondent questioned the sufficiency of appellant's residence in California to support an action for divorce. We quote his testimony on that matter:

"Q. What was the conversation with the attorney about residence? A. I asked him how my wife could file a suit down there three weeks after her arrival in California. He said 'She has furniture in storage here in Long Beach and that constitutes a residence in this state.' I said 'I don't

believe it does, but you know she had only been down here three weeks when you filed that action.' "

At the time of signing the property settlement agreement, respondent was served with a copy of the summons and complaint in the action instituted by appellant. On the following morning, November 15, 1946, respondent left California and returned to Richland, Washington, bringing the two children with him. On December 23, 1946, appellant obtained an "interlocutory judgment of divorce," by default, in the California court.

In the meantime, respondent, having returned to Washington, was informed of certain acts of misconduct of the appellant while living with him in Richland, of which acts respondent had previously been ignorant. After an investigation of the reported acts, he instituted the present action for divorce. The cause came on for hearing, at which both parties were present and testified. At the conclusion of the trial, the court entered the order from which this appeal was taken.

Appellant contends that the facts with respect to residence having been fully submitted to the California court, which is a court of competent jurisdiction, and respondent having failed to contest that action, and the California court having made its findings with respect to residence in that state, and the question being one of law deducible from the facts, and the California court having drawn its conclusions and entered its judgment thereon, the judgment of that court should be given full faith and credit in the courts of this state.

Contrary to appellant's contention, the record herein does not show that the full facts as stated above were disclosed to the California court. We quote appellant's own direct testimony upon the subject:

"Q. What was told the California court with respect to your residence? A. Mr. Hodges [the attorney] asked me how long I had been out of the State of California, what my husband was doing, and I told him he was on defense work, he said 'Was he in the service?' and I said 'No', he asked why and I told him on account of his age. Q. Was this

at the court hearing? A. Mr. Hodges asked me this in court and then the Judge said to me 'Was he ever called for service' and I said 'not to my knowledge' so he said that was all and granted the divorce."

So far as the record before us discloses, that was the only information given to the California court.

In two recent decisions of this court, it has been laid down as the law that the provisions of the Federal constitution requiring that full faith and credit be given in each state to the judicial proceedings of every other state do not prevent a collateral attack upon the jurisdiction of a sister state to render a judgment which is later offered in evidence in an action brought in another state, and that the record of a judgment rendered in the sister state may, in such collateral attack, be contradicted as to the facts necessary to give the court of that state jurisdiction. *Mapes v. Mapes*, 24 Wn. (2d) 743, 167 P. (2d) 405; *Wampler v. Wampler*, 25 Wn. (2d) 258, 170 P. (2d) 316.

Those cases also hold that proof of residence is essential, and that a divorce obtained with the aid of an assumed residence is not in good faith and does not give the court jurisdiction of the cause.

It is also held in the *Mapes* case, *supra*, and the cases cited therein that domicile or residence is mainly a question of intent, which may be shown by the testimony of the parties and by surrounding circumstances.

In the case at bar, the trial court found from the testimony of the parties and the surrounding circumstances that the parties to this action intended to, and did, establish a residence in the state of Washington. We think the preponderance of the evidence supports such finding.

If the residence of the parties was in Washington on October 13, 1946, as the trial court held, the appellant could not have had a domiciliary residence in the state of California at the time she instituted her action there. The trial court in the present action had the authority and right to declare the judgment of the California court void.

Appellant's second assignment of error relates to the granting of the divorce to the respondent and the refusal to

grant it to the appellant. The statement of facts consists of one hundred thirty-seven pages, comprising the testimony of twenty witnesses. A considerable portion of the testimony constitutes a narration of the acts and conduct of the parties during their married life while residing in Richland, their treatment of each other, and the care which they bestowed, or failed to bestow, upon the children. As may be expected, the evidence was in conflict, reflecting credit or discredit upon the one party or the other, according to whose evidence was believed. The trial court saw and heard the various witnesses and, at the conclusion of the trial, analyzed the evidence in a lengthy memorandum decision. Thereafter, the court made findings of fact concerning various acts of misconduct on the part of the appellant, including, particularly, her frequent absence from home, her neglect of the children, her indulgence in intoxicating liquor at improper times and places, and her unseemly conduct and association with other persons in the absence and without the knowledge of her husband. The court further found that respondent is a fit person, and the appellant not a fit person, to have the care and custody of the children. Upon the facts as found, the court entered an interlocutory order of divorce in favor of respondent.

No good is to be accomplished by setting out in detail the evidence supporting the facts as found by the court, nor do we deem it either necessary or advisable in this instance to do so. The parties and their counsel are well aware of the facts as determined by the evidence; others have no particular interest or concern therein. In justice to the appellant, however, we will say that the evidence does not warrant a finding of immoral conduct on her part; rather does it illustrate a series of indiscretions manifested by her at various times. Our reading of the record nevertheless convinces us of the correctness of the court's order granting the divorce to the respondent.

Appellant finally assigns error upon the finding of the trial court that she is not a fit person to have the care

and custody of the children, and upon the order based thereon awarding custody of the children to the respondent.

In addition to the facts already set forth or referred to herein, the following may be added: Of the $3,725 which the appellant had on October 13, 1946, when she left respondent, there remained only about $1,300 on February 6, 1947, the day on which she appeared in this action on her application for suit money and attorneys' fee. In other words, within four months she had spent a total of approximately $2,500, during which time she had custody of the children for only a month. There is no evidence that, since her separation from her husband, she has done anything to establish a home for the children, who, except for a period of one month, have been in the custody and under the care of the respondent. So far as the record discloses, the furniture and household equipment, though located in Long Beach, are still in storage. As hereinabove stated, appellant by written agreement permitted respondent to take the children to Richland, where he was to keep them until she should establish a suitable home for them in California.

In his memorandum decision, the trial judge stated:

"The Court will grant the plaintiff [respondent] a divorce and give him custody of the children until the further order of the Court, restraining her from taking the children and allowing her the right to visit the children. When you [appellant] are more settled and can prove you are a fit person you can have the order modified. Custody of children is never permanent, it is always until the further order of the Court. You still have before you an opportunity, by time and your conduct, to show you are a fit and proper person, and then you may get your children."

█ The trial court made findings that respondent is a man of good habits, that he is capable of providing a good home for the children, and that he has made proper provision for their care. The evidence supports those findings. Moreover, appellant obviously thought that respondent was able to, and would, properly care for the children; otherwise, she would not have turned them over to him.

In its interlocutory order, the court specifically reserved jurisdiction of the minor children for any and all purposes which, in the judgment and discretion of the court, may be beneficial to them.

In urging her present claim for custody of the children, appellant relies largely upon the statement or declaration made in a number of our decisions to the effect that children of tender years will not be taken from their mother unless it clearly appears that she is so far an unfit and improper person that her custody of the children would endanger their welfare. *Freeland v. Freeland,* 92 Wash. 482, 159 Pac. 698; *Prothero v. Prothero,* 137 Wash. 349, 242 Pac. 1; *Maley v. Maley,* 18 Wn. (2d) 766, 140 P. (2d) 262; *In re Hansen,* 21 Wn. (2d) 695, 152 P. (2d) 712; *Sinnott v. Sinnott,* 27 Wn. (2d) 520, 179 P. (2d) 305.

In cases involving the custody of children, the cardinal rule, as repeatedly stated and always recognized by this court, is that the welfare of the child, or children, is the paramount and controlling consideration. *Broesch v. Broesch,* 159 Wash. 409, 293 Pac. 464; *Ayers v. Ayers,* 188 Wash. 540, 62 P. (2d) 1358; *Eliason v. Eliason,* 10 Wn. (2d) 719, 118 P. (2d) 170; *Taylor v. Taylor,* 14 Wn. (2d) 293, 126 P. (2d) 855; *Maley v. Maley, supra; Campbell v. Campbell,* 19 Wn. (2d) 410, 143 P. (2d) 534; *Bornstine v. Bornstine,* 21 Wn. (2d) 104, 150 P. (2d) 60; *Lindblom v. Lindblom,* 22 Wn. (2d) 291, 155 P. (2d) 790; *Hathaway v. Hathaway,* 23 Wn. (2d) 237, 160 P. (2d) 632; *Mitchell v. Mitchell,* 24 Wn. (2d) 701, 166 P. (2d) 938; *Schorno v. Schorno,* 26 Wn. (2d) 11, 172 P. (2d) 474; *Martin v. Martin,* 27 Wn. (2d) 308, 178 P. (2d) 284; *Sewell v. Sewell, ante* p. 190, 186 P. (2d) 372.

It is not necessary to prove moral unfitness on the part of the mother in order to justify the court in awarding the custody of the children to the husband and father; the health and well-being of the children must be taken into consideration at all times. *Lindblom v. Lindblom, supra; Storgaard v. Storgaard,* 26 Wn. (2d) 388, 174 P. (2d) 309.

Another rule, stated in a number of the cases above cited and regularly followed by this court, is that, in con-

sidering appeals in cases of this kind, great weight will be accorded to the decision of the trial court, which has the benefit of seeing and hearing the witnesses and observing the trial atmosphere.

We have also stated in many of the foregoing decisions that each case must be determined upon its own peculiar facts.

The attitude of this court and the rules by which it is governed in cases of this kind are clearly and definitely set forth in the *Schorno* case, *supra*, in the following quotation therefrom:

"In such cases as this, there are three major elements which are always accorded great weight: First, in all cases, the welfare of the child or children concerned is the primary consideration; second, that, in awarding the custody of young children, the mother, if she desires the custody of her children, unless morally or physically unfit, is generally given such custody for reasons which we have repeatedly stated; third, this court, in considering appeals from orders such as is now before us, accords great weight to the decision of the trial court which had the benefit of hearing the witnesses, in most cases, of seeing the children in question, and of obtaining a general trial atmosphere, none of which advantages this court enjoys.

"All the principles above stated are, however, subject to the rule that each case must be determined upon its own peculiar facts. [Citing cases.]"

Under the evidence adduced, the trial court became convinced that the welfare of these children would be best served by placing them in the custody of their father, with jurisdiction over the children reserved in the court for any and all purposes which in the judgment and discretion of the court may be beneficial to them.

We not only are unable to say that the trial court abused its discretion in making such order, but also we are convinced, after a careful study of the record, that the interlocutory order was in all respects proper and correct.

Affirmed.

MALLERY, C. J., BEALS, SCHWELLENBACH, and JEFFERS, JJ., concur.